IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs December 18, 2018

**STATE OF TENNESSEE v. BRYAN KEVIN THOMAS**

**Appeal from the Circuit Court for Blount County**
**No. C-19606    David R. Duggan, Judge**

_____

**No. E2017-02247-CCA-R3-CD**

_____

The Defendant, Ryan Kevin Thomas, was indicted for first degree premeditated murder; first degree felony murder; and theft of property valued at more than $500 but less than $1000; a Class E felony. See Tenn. Code Ann. §§ 39-13-202, -14-103, -14-105 (2010). Following a jury trial, the Defendant was convicted of the lesser-included offense of second degree murder, a Class A felony, and of the charged offenses of first degree felony murder and theft. See Tenn. Code Ann. § 39-13-210 (2010). The trial court later merged the second degree murder conviction into the first degree felony murder conviction and imposed a total effective sentence of life. On appeal, the Defendant contends that (1) the evidence was insufficient to sustain the Defendant's convictions for first degree felony murder and second degree murder; (2) the trial court erred in admitting an autopsy photograph; (3) the trial court erred in excluding hearsay testimony from a proposed witness for the defense; and (4) the trial court erred in approving the jury's verdict as the thirteenth juror.[1] Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Ashley Morris Bentley, Maryville, Tennessee, for the appellant, Bryan Kevin Thomas.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Michael L. Flynn, District Attorney General; and Shari Lynn Tayloe, Matthew Dunn, and Ryan Kevin Desmond, Assistant District Attorneys General, for the appellee, State of Tennessee.

_____

[1] We have reordered and renumbered the issues as they appear in the Defendant's brief for clarity.

# OPINION

## FACTUAL BACKGROUND[2]

Kristi Dixon met the Defendant at the Thornhill Trailer Park in November 2010. When asked to describe her relationship with the Defendant, Ms. Dixon testified that they "[s]mok[ed] crack cocaine" together. Sometime during the night of November 23 and early morning hours of November 24, 2010, Ms. Dixon was told to leave the Thornhill Trailer Park. Ms. Dixon recalled that the Defendant had no money or drugs with him while they were at the trailer park. The Defendant also did not have a cell phone, but he used someone else's phone and "called for a ride." According to Ms. Dixon, the Defendant was wearing "black, wind-breaker type pants . . . and a green pullover . . . sweatshirt" with a T-shirt with rolled up or ripped off sleeves underneath. Ms. Dixon recalled that before they left the trailer park, the Defendant got "a change of clothes." The Defendant got "a T-shirt, and a pair of socks and boxers wrapped up in a pair of pants."

The victim, Steven Payne, picked up the Defendant and Ms. Dixon at the trailer park and drove them to his apartment. Ms. Dixon testified that she had never met the victim before. Once at the victim's apartment, they watched television in the living room. Ms. Dixon recalled that the Defendant drank a beer. Ms. Dixon drifted in and out of sleep as they watched television. At some point, the Defendant went to the victim's bedroom and then called for Ms. Dixon. In the bedroom, the Defendant told Ms. Dixon that the "TV and stuff" in the living room was his and that the victim was just keeping it for him until he had "a place to put it." Ms. Dixon testified that, "a minute" later, the Defendant said, "I'm going to have to knock this mother f--ker out." Ms. Dixon thought the Defendant was just "talking crap" because "he said that . . . about other people," but had "never followed through with anything like that."

Ms. Dixon fell asleep in the bedroom, but woke up when she overheard the Defendant making phone calls with the victim's cell phone. Ms. Dixon recalled that the Defendant was giving someone directions to the victim's apartment. Ms. Dixon eventually went back to the living room. Ms. Dixon recalled that the victim was lying down on the couch and was coved up to his chest "with a beige blanket." Ms. Dixon fell asleep in the living room. The Defendant eventually woke her and told her to go to the bathroom because they were "fixing to leave." On her way to the bathroom, the Defendant stopped her and whispered to her that she should "stay in there for a few minutes."

---

[2] This section will address the factual background of the Defendant's convictions. The factual background of the Defendant's procedural issues will be discussed in the relevant portions of our analysis.

In the bathroom, Ms. Dixon used the toilet, washed her hands, and checked her makeup. Ms. Dixon estimated that she was in the bathroom between two to four minutes. However, Ms. Dixon admitted that she did not actually know how long she was in the bathroom that morning. Ms. Dixon recalled that she could not hear anything in the bathroom because the fan "was really, really loud." As she was getting ready to exit the bathroom, the Defendant opened the door. According to Ms. Dixon, the Defendant "had a blank kind of stare on his face." Ms. Dixon noticed that all of the lights in the apartment were off and that the Defendant "had [the] pathway [back to the living room] blocked" with the victim's television "and a black garbage bag." Ms. Dixon also noticed that there was a red jacket covering the victim's face that had not been there when she went to the bathroom. Ms. Dixon saw the victim's arm drop and thought he was asleep.

According to Ms. Dixon, the Defendant "pushe[d] [her] out of the apartment." They waited outside in the cold while the Defendant used the victim's cell phone to give someone directions to the victim's apartment. Eventually, a car backed up to the victim's door. The car was driven by Nicholas Buchanan. Ms. Dixon had never met Mr. Buchanan before that morning. Ms. Dixon got in the front seat of Mr. Buchanan's car while the Defendant and Mr. Buchanan went into the victim's apartment and got the television. The Defendant and Mr. Buchanan put the television in the backseat of Mr. Buchanan's car. The Defendant then put the black garbage bag on the back floorboard. The Defendant also took off his sweatshirt, turned it inside out, and put it on the front passenger floorboard.

Mr. Buchanan drove the Defendant and Ms. Dixon to a nearby hotel. On the way, Ms. Dixon noticed that the Defendant was "acting really funny." Ms. Dixon explained that the Defendant "kept looking in the rearview mirror, kept looking in the passenger side mirrors, kept looking behind him[,] and stuff." According to Ms. Dixon, the Defendant told Mr. Buchanan as they drove to the hotel that he "might want to get that f--king [cell phone] number changed." When asked why, the Defendant replied, "[D]on't worry about it. This ain't my first rodeo."

After arriving at the hotel, the Defendant paid for a room and got the garbage bag and his sweatshirt out of Mr. Buchanan's car. The Defendant and Ms. Dixon went to their room where they smoked "some dope." Ms. Dixon recalled that the Defendant put the garbage bag under the sink in the bathroom and did not let her get near it. At some point, the Defendant left and returned with items he bought at a convenience store along with "more dope." Before they checked out, the Defendant changed his clothes and put the clothes he had been wearing in the garbage bag. Ms. Dixon and the Defendant then made their way back to the Thornhill Trailer Park where they parted ways.

Ms. Dixon admitted that she never saw the Defendant hit the victim. Ms. Dixon also admitted that she saw no blood in the victim's apartment or on the Defendant's

clothing. However, Ms. Dixon "didn't look" for blood that morning. Ms. Dixon further admitted that she was unaware that the victim was dead until she spoke to detectives several days later.

Mr. Buchanan testified at trial that he knew the Defendant "through a mutual friend" and that they had "a business kind of relationship." Mr. Buchanan explained that he sold drugs and that in November 2010 he had told the Defendant that he would trade drugs for a television. The Defendant told Mr. Buchanan that "he would let [Mr. Buchanan] know when he got the television." During the early morning hours of November 24, 2010, the Defendant texted Mr. Buchanan and said that "he had something for [Mr. Buchanan]" and "to come pick it up," but that it had to be done "before sunrise." The Defendant then called Mr. Buchanan and gave him directions to the victim's apartment. Mr. Buchanan had never been to the apartment before and did not know the victim.

Mr. Buchanan met the Defendant outside of the victim's apartment. Mr. Buchanan spoke to the Defendant, and Ms. Dixon got into Mr. Buchanan's car. Mr. Buchanan and the Defendant then went to the victim's door. According to Mr. Buchanan, a television and a Blu-ray player were by the victim's door. Mr. Buchanan claimed that he took only "one step" inside the victim's apartment as he helped the Defendant carry the television back to his car. Mr. Buchanan admitted that he did not see any blood in the victim's apartment, but the apartment was dark and he was not looking for blood. Mr. Buchanan also did not see any blood on the Defendant's clothes, but he again was not looking for blood and could not recall what the Defendant was wearing that morning. The Defendant and Mr. Buchanan put the television and the Blu-ray player in Mr. Buchanan's car. Mr. Buchanan recalled that the Defendant also had "a little plastic bag" with "clothes or something" that he put in Mr. Buchanan's car.

Mr. Buchanan drove the Defendant and Ms. Dixon to a nearby hotel. Along the way, Mr. Buchanan asked to buy the cell phone the Defendant had with him, but the Defendant said "he couldn't sell it to" Mr. Buchanan. Mr. Buchanan recalled that the Defendant "may have told [Mr. Buchanan] to change his number or something." At the hotel, Mr. Buchanan paid the Defendant for the television and Blu-ray player. The Defendant went inside and rented a room and came back to get Ms. Dixon. Mr. Buchanan sold the television and Blu-ray player to his cousin. Later that day, Mr. Buchanan met the Defendant at the Thornhill Trailer Park to pay the Defendant the rest of the money he owed for the television and Blu-ray player.

On the evening of November 25, 2010, the victim's family called police to request a welfare check on the victim because he did not show up for Thanksgiving dinner and did not answer his phone. The responding officers found the victim's car parked outside his apartment and the door locked. The officers entered the apartment and it "smelled

-4-

like death." The only light on in the apartment was in a bathroom by the front door. The apartment was messy but there were no "signs of struggle" inside. The officers found the victim's body lying on the couch. The victim was covered with a blanket up to his chest, his "arms exposed," and a red jacket covering his head. There was "a lot of blood in the area where [the body] was laying" as well as "blood splatter on the wall and . . . on the ceiling." The responding officers exited the apartment and called for investigators to respond to the scene.

Maryville Police Department Sergeant Ronnie Pryor was the investigator "on call" that evening. Sgt. Pryor recalled that there was a red "fleece jacket covering the [victim's] head" that "was soaked in blood" and that had dried blood and "some skull fragments" in the area where it had covered the victim's wounds. Former Maryville Police Department Investigator Donnie Debuty[3] recalled that the victim's "skull was busted open[,] . . . it was just like his head was flat in places." "The majority" of the blood from the victim's wounds had seeped "down into the arm of the couch." The investigators also found "some bone fragments down in [that area of] the couch." Blood spatter was found throughout the living room, but most of it was concentrated in the area around the couch.

The investigators found a box for a cell phone but were unable to locate the victim's cell phone in his apartment. The investigators obtained the records for the victim's cell phone. The victim's cell phone records revealed that there were thirteen phone calls to and from the victim's cell phone and Mr. Buchanan between 2:43 and 4:44 a.m. on November 24, 2010. There was also a text message from the victim's cell phone to Mr. Buchanan at 3:20 a.m. that morning which stated that it was "Kevin," that he had "that," and that Mr. Buchanan needed to call him "back tonight" or he was doing "something else with it" because he could not "keep it till dawn."

Using Mr. Buchanan's cell phone number found in the victim's cell phone records, the investigators located Mr. Buchanan and questioned him. Mr. Buchanan told the investigators about the television and Blu-ray player he had bought from the Defendant and that he had dropped off the Defendant and Ms. Dixon at a Comfort Inn Suites. The investigators retrieved a receipt from the hotel showing that "Bryan Thomas" had checked in at 5:15 a.m. on November 24, 2010, and paid for his room with cash. The investigators also found security camera footage from a convenience store located near the hotel showing the Defendant's making a purchase at approximately 9:00 a.m. on November 24, 2010, and wearing the clothing described by Ms. Dixon.

---

[3] Investigator Debuty was the lead investigator in this case but had been terminated from the Maryville Police Department prior to trial for his mishandling of evidence in an unrelated case.

Mr. Buchanan arranged for the investigators to meet his cousin so they could seize the television and Blu-ray player. The serial numbers on the television and Blu-ray player matched the serial numbers found on boxes at the victim's apartment. The investigators found what they believed to be blood stains on the television and Blu-ray player and took samples for forensic testing. Later forensic testing by the Tennessee Bureau of Investigation showed that the sample taken from the television was negative for the presence of blood. However, the sample taken from the Blu-ray player tested positive for blood and was a partial match to the victim's DNA.

Mr. Buchanan also took the investigators to the Thornhill Trailer Park where he had last seen the Defendant. The investigators took the Defendant into custody at the trailer park. When they interviewed the Defendant, he initially denied being at the victim's apartment on the morning of November 24, 2010. However, the Defendant eventually admitted to being at the victim's apartment and stealing the victim's television and Blu-ray player. The Defendant insisted that he did not kill the victim. One of the investigators saw what he believed to be blood on the Defendant's shoes and seized them. Later forensic testing by the Tennessee Bureau of Investigation revealed that there was blood on the Defendant's shoes and that it matched the victim's DNA. The Defendant claimed that when he was arrested, he was wearing the same clothes he wore on November 24, 2010, but, except for his shoes, the clothes were not the same as those seen on security camera footage from the convenience store.

No weapon was ever found. Neither was the black bag Ms. Dixon testified that the Defendant had that morning nor the clothes the Defendant was wearing. The investigators searched Mr. Buchanan's car, but found no evidence of blood inside it. The investigators did not attempt to recover fingerprints from the victim's television stand or the television and Blu-ray player. The investigators did obtain a recording of a phone call the Defendant made from jail to his mother on November 28, 2010. In the recording, the Defendant stated that he was "in trouble" and that "[h]e scared me, Mama, he scared me[,] . . . I thought he was going to kill me, Mama." The investigators also obtained a recording of a jail phone call the Defendant made to his mother on November 29, 2010. In that recording, the Defendant said that Ms. Dixon was lying because she was in the bathroom and "she didn't even see nothing [sic] was going on."

Doctor Steven Cogswell, an expert in forensic pathology, performed an autopsy on the victim's body on November 26, 2010. Dr. Cogswell noted that when he examined the victim's body, rigor mortis had "faded" and lividity had set in. Dr. Cogswell also noted that "some early decomposition had started" as evidenced by greenish discoloration "mostly prominent around his head and neck area, primarily in his face." Given that decomposition had started in the victim's body, Dr. Cogswell opined that the victim had been dead "probably about two days or so" prior to the autopsy.

The victim suffered a laceration along his left jawline and abrasions on his left neck and chest. The victim "had a significant number of blunt force injuries, primarily on the front and right side of his head." The lacerations to the front of the victim's head were "quite deep and actually [went] through the skull and into the brain" with "multiple skull fractures associated with them." On the right side of the victim's head above the victim's ear were three lacerations in the shape of an "H." In total, Dr. Cogswell identified eight major lacerations suggesting "at least eight distinct blows" to the victim's head. Dr. Cogswell explained that the lacerations were "all linear . . . but not all running parallel" and this "most likely" meant that they each represented "a separate blow."

Dr. Cogswell explained that when the victim's head was raised "a little bit," "all of the underlying skull . . . all the way down to the face and certainly up into the area covering the brain, ha[d] been fractured. And fractured into enough small pieces that [the victim's head] actually starting to sink in." Put another way, "[t]hat whole area [was] crushed in." Dr. Cogswell also found that the victim's brain had been "pulped." Dr. Cogswell explained that the "[f]rontal parietal and temporal lobes" of the victim's brain had "been essentially chopped up mostly by the edges of . . . the broken pieces of the skull being driven into them by the multiple hits." The combination of "all the blows that essentially crushed in the right side of [the victim's] skull . . . were ultimately fatal," and the victim likely died within a few minutes of being struck.

Dr. Cogswell was unable to determine if the victim had been hit by a single object or multiple objects. Dr. Cogswell was also unable to determine specifically what was used to hit the victim, but could generalize that it was "a relatively heavy blunt object." Dr. Cogswell consulted with a forensic anthropologist, Doctor Murray Kevin Marks, to reconstruct the victim's skull and attempt to determine how many times the victim was struck. Dr. Marks reconstructed the victim's skull, but some of the bone fragments were "broken to such a fine degree that [he] couldn't glue them back together." Dr. Marks determined that the victim suffered "at least four strikes to the skull, four penetrating wounds; two to the front and two to the side." Dr. Marks opined that the wounds were inflicted "[w]ith a lot of force."

Paulette Sutton, an expert in blood stain pattern analysis, testified at trial on behalf of the Defendant. Ms. Sutton opined that the victim was lying down when he was struck. Based on the fact that some of the blood on the couch had clotted, Ms. Sutton opined that the victim was struck and that at least six to eight minutes passed before he was struck again. Ms. Sutton also opined that the victim was initially struck without the red jacket covering his face, that the jacket was placed over his head "later in the assault," and that the victim was then struck again.

Ms. Sutton opined that "it would be very difficult for . . . an assailant not to have gotten blood spatter on them" given "the amount of distribution of the spatter" at the

crime scene. Based on the stains on the Defendant's shoes and the forensic testing showing that the stains were caused by the victim's blood, Ms. Sutton opined that the Defendant's shoes "were in the proximity of a spatter-producing event." Ms. Sutton admitted that "a covering over [the] torso," like an apron, would allow a person to leave the crime scene without having blood spatter on their clothes. Ms. Sutton also admitted that it would be more difficult to see blood spatter on dark clothing or in dim lighting.

Based upon the foregoing, the jury convicted the Defendant of first degree felony murder, theft of property valued at more than $500 but less than $1000, and the lesser-included offense of second degree murder. The trial court held a sentencing hearing on July 15, 2013, where it merged the Defendant's second degree murder conviction into his first degree murder conviction and imposed a total effective sentence of life. A motion for new trial was filed on August 9, 2013. On October 30, 2017, the trial court held a hearing on the Defendant's motion for new trial where it denied the motion and approved the jury's verdict as the thirteenth juror.[4] The Defendant now appeals to this court.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his convictions for first degree felony murder and second degree murder. The Defendant essentially argues that the State failed to prove that he was the perpetrator of the offense. Specifically, the Defendant argues that he would not have been able to kill the victim in the two to four minutes Ms. Dixon testified that she was in the bathroom, that the victim was killed more than forty-eight hours prior to the autopsy, and that the perpetrator would likely "have been covered in blood at least from the waist up." The State responds that the evidence was sufficient to sustain the Defendant's convictions for first degree felony murder and second degree murder.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness

---

[4] There is no explanation in the record for the four-year delay between the filing of the motion for new trial and the motion for new trial hearing.

credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury.  See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict."  Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).  A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility."  State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987).  However, "[t]here is no requirement that the State's proof be uncontroverted or perfect."  State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983).  Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt."  Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).  Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence."  State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011).  The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State."  State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).  Additionally, the identity of the perpetrator "is an essential element of any crime."  State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006).  However, the perpetrator's identity "may be established solely on the basis of circumstantial evidence."  State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010).

Here, first degree felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate . . . [a] theft[.]"  Tenn. Code Ann. § 39-13-202(a)(2) (2010).  "No culpable mental state is required for conviction" of first degree felony murder, "except the intent to commit the enumerated" offense.  Tenn. Code Ann. § 39-13-202(b) (2010).  Theft occurs when a person, "with intent to deprive the owner of property, . . . knowingly obtains or exercises control over the property without the owner's effective consent."  Tenn. Code Ann. § 39-14-103 (2010).

"The felony murder rule applies when the killing is 'done in pursuance of the unlawful act, and not collateral to it.'"  State v. Thacker, 164 S.W.3d 208, 223 (Tenn. 2005) (quoting Farmer v. State, 296 S.W.2d 879, 883 (Tenn. 1956)).  Nonetheless, "[t]he killing may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action."  Id. (internal quotation marks omitted) (quoting State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999)).  The jury "may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to

-9-

commit the felony prior to, or concurrent with, the killing." Id. (internal quotation marks omitted) (quoting Buggs, 995 S.W.2d at 106).

Also as pertinent to our review, second degree murder is the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2010). Second degree murder is a result of conduct offense. State v. Brown, 311 S.W.3d 422, 431 (Tenn. 2010). Therefore, a person acts knowingly "with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b).

Here, there was ample evidence to establish the Defendant's identity as the perpetrator of the victim's murder. Ms. Dixon testified that while they were at the victim's apartment, the Defendant stated that he was "going to have to knock this mother f--ker out." The Defendant also made numerous phone calls with Mr. Buchanan arranging to sell the victim's television and Blu-ray player to him and giving him directions to the victim's apartment. The Defendant told Ms. Dixon that they were about to leave and to go to the bathroom. On her way to the bathroom, the Defendant whispered to her that she should "stay in there for a few minutes." The Defendant later opened the door to the bathroom with "a blank kind of stare on his face."

When Ms. Dixon exited the bathroom, all of the lights in the victim's apartment were off and the Defendant had blocked the path to the living room with the victim's television. Ms. Dixon saw a red jacket covering the victim's face that had not been there when she went to the bathroom. Ms. Dixon testified that the Defendant "pushe[d] [her] out of the apartment" and that they waited for Mr. Buchanan outside in the cold. The Defendant removed his sweatshirt and turned it inside out prior to getting into Mr. Buchanan's car. The Defendant also had a black garbage bag that he eventually put his clothes into and that he would not let Ms. Dixon near once they arrived at their hotel room. Blood was found on the victim's Blu-ray player that was a partial match to the victim's DNA. More importantly, the victim's blood was found on the Defendant's shoes. The Defendant also made incriminating statements during phone calls to his mother shortly after his arrest.

The Defendant argues that "[t]he timelines and the physical evidence . . . do not support" the conclusion that he murdered the victim during the theft of the victim's television and Blu-ray player. However, the questions of how long Ms. Dixon was in the bathroom, the victim's exact time of death, and why Ms. Dixon and Mr. Buchanan did not recall seeing blood on the Defendant are all questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence that were resolved by the jury. See Bland, 958 S.W.2d at 659. We will not disturb the jury's determinations on appeal. Accordingly, we conclude that the evidence was sufficient to

sustain the Defendant's convictions for first degree felony murder and second degree murder.

## II. Autopsy Photograph

The Defendant contends that the trial court erred in admitting an autopsy photograph. The Defendant argues that the photograph was overly gruesome, did not aid the trier of fact, and was duplicative of "other photographs admitted" into evidence. The State responds that the trial court did not abuse its discretion in admitting the photograph.

Prior to Dr. Cogswell's testimony, the trial court held a jury-out hearing on six autopsy photographs the State sought to admit. Dr. Cogswell testified that the first photograph showed the victim "as-is" at the start of the autopsy and the second photograph showed the injuries to the left side of the victim's face, neck, and chest. These photographs were in color to show "the extent of decomposition." Dr. Cogswell testified that these photographs needed to be shown in color to show the discoloration and decomposition of the victim's body in order to estimate the victim's time of death.

The next photograph showed the destruction of the victim's skull with the head "kind of collapsing [on] the right side of the face." The State sought to have this photograph admitted in color. The next three photographs illustrated a sequential "walk around from the front to the right side [of the victim's head] . . . to track the series of injuries." Dr. Cogswell explained that in each photograph of the series, "a particular injury or a pair of injuries [was] seen more clearly than in [the] other photographs." Dr. Cogswell testified that no one photograph could show all of the victim's injuries given the curve of the victim's head and that it was impossible to understand the full extent of the victim's injuries without showing all three photographs in sequential order.

At the conclusion of the Dr. Cogswell's jury-out testimony, defense counsel objected to the admission of the second of the three sequential photographs. Defense counsel argued that this photograph was duplicative of the other two. The trial court noted that it did not believe that the photographs were overly gruesome. The trial court allowed the first two photographs to be shown in color, but ordered that the remaining photographs be shown in black and white. The trial court ruled that the objected photograph was not duplicative. The trial court accredited Dr. Cogswell's testimony that it demonstrated some injuries more clearly than the other photographs and was necessary to demonstrate the full extent of the victim's injuries.

The admissibility of photographs is governed by Tennessee Rules of Evidence 401 and 403. See State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). Under these rules, the trial court must determine, first, whether the photograph is relevant. Tenn. R. Evid. 401; Banks, 564 S.W.2d at 949. Next, the trial court must determine whether the probative

value of the photograph is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; Banks, 564 S.W.2d at 950-51. "Unfair prejudice" is an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 951.

Tennessee courts follow a liberal policy in the admission of photographs in both civil and criminal cases. Banks, 564 S.W.2d at 949. As such, whether to admit a photograph rests within the sound discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion. Id.; see also State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); State v. Allen, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

"Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issue at trial and probative value is not [substantially] outweighed by their prejudicial effect." State v. Brock, 327 S.W.3d 645, 694 (Tenn. Crim. App. 2009). Autopsy photographs, in particular, must never be used "solely to inflame the jury and prejudice them against the defendant" and must be relevant to prove some material aspect of the case. Banks, 564 S.W.2d at 951. Additionally, this court has held that "photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used." State v. Derek Williamson, No. M2010-01067-CCA-R3-CD, 2011 WL 3557827, at *9 (Tenn. Crim. App. Aug. 12, 2011).

Here, the trial court held a jury-out hearing to review all of the photographs the State sought to admit. The Defendant challenged only one of the photographs, the second of the three sequential photographs. In allowing admission of the photograph, the trial court accredited Dr. Cogswell's testimony that the photograph demonstrated some injuries more clearly than the other two and was needed to help demonstrate the full extent of the victim's injuries. Accordingly, we conclude that the trial court did not abuse its discretion in admitting this photograph.

Moreover, the challenged photograph was no more gruesome than the other autopsy photographs the Defendant did not challenge. In fact, it was less gruesome than the photograph showing the destruction of the victim's skull with the head "kind of collapsing [on] the right side of the face," which the Defendant did not object to. Therefore, even if the admission of the challenged photograph was error, it would ultimately have been harmless error. See State v. Foust, 482 S.W.3d 20, 49 (Tenn. Crim. App. 2015) (holding that admission of the challenged autopsy photograph was harmless error when "several other graphic and gruesome autopsy photographs [were] admitted" without objection from the defendant).

## III. Hearsay Testimony

The Defendant contends that the trial court erred in excluding hearsay testimony from a proposed witness that, a few weeks prior to the murder, the victim was "worried" because his car was vandalized. The Defendant argues that this testimony fell "under the [hearsay] exception of the declarant's then existing state of mind." The Defendant sought to use this testimony to argue that the victim was killed by an unknown third person and to "impeach the reliability of the police investigation." The State responds that the trial court did not err in excluding the testimony.

During a jury-out hearing, the Defendant presented the testimony of Shannon Malanga. Ms. Malanga testified that she was a friend of the victim. Ms. Malanga testified that she had a conversation with the victim while they were at work "[a] few weeks prior" to the victim's murder. According to Ms. Malanga, the victim told her that he and a man he had met at a local bar were "playing pool at [the victim's] house." This man "was not aware that [the victim] was homosexual and when that came out[,] . . . this man got angry." Ms. Malanga testified that the victim told her that the man "had thrown a rock through his window and his car." Ms. Malanga testified that the victim was "[n]ot scared," but "was frustrated" and "[w]orried." Ms. Malanga further testified that the victim told her that "if anything happened to him to investigate" the bar where he had met the man and that he had asked his landlord to install security cameras "in his parking lot."

The trial court ruled that Ms. Malanga's testimony was not relevant to this case and that it did not satisfy the hearsay exception for the declarant's then existing state of mind because it was being offered to prove the conduct of a third party rather than the declarant.

"Hearsay" is defined as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A "statement" is "(1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by the person as an assertion." Tenn. R. Evid. 801(a). Hearsay is not admissible except as allowed by the rules of evidence or other applicable law. Tenn. R. Evid. 802. The questions of whether a statement is hearsay or fits under one of the exceptions to the hearsay rule are questions of law and subject to de novo review by this court. Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015), cert. denied, 136 S. Ct. 335 (2015).

One exception to the prohibition against hearsay is "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)[.]" Tenn. R. Evid. § 803(3). "[D]eclarations of mental state will be admissible to prove [the] mental state at issue or subsequent conduct consistent with that mental state." Tenn. R. Evid. § 803(3),

-13-

Advisory Comm'n cmt. However, "only the declarant's conduct, not some third party's conduct is provable by this hearsay exception." Id.; see also State v. Howard, 504 S.W.3d 260, 282-83 (Tenn. 2016) (quoting the Advisory Commission Comment and holding that the state of mind hearsay exception does not apply to a third party's conduct). We agree with the trial court that the hearsay testimony was not offered to prove the victim's then state of mind or subsequent conduct, but to prove the conduct of a third party. Specifically, the Defendant sought to introduce the testimony to prove that an unknown third person killed the victim or to "impeach the reliability of the police investigation." Accordingly, we conclude that the trial court did not err in excluding Ms. Malanga's testimony.

The Defendant also argues that the trial court's exclusion of Ms. Malanga's testimony violated his constitutional right to present a defense. However, the Defendant raises this argument for the first time on appeal. As such, the Defendant has waived plenary review of this issue. See State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996) (stating that "issues raised for the first time on appeal are waived"). Nor has the Defendant established that plain error review is warranted. Here, consideration of the Defendant's argument is not necessary to do substantial justice. State v. Minor, 546 S.W.3d 59, 67 (Tenn. 2018). The evidence of the Defendant's guilt in this case was overwhelming. Moreover, the Defendant spent a significant portion of the trial attempting to "impeach the reliability of the police investigation." Likewise, the Defendant cross-examined Ms. Dixon and Mr. Buchanan extensively in an attempt to show that the victim was still alive when the Defendant left his apartment. Accordingly, we conclude that plain error review of this argument is not warranted.

### IV. Thirteenth Juror

The Defendant contends that the trial court failed to fulfill its duty as the thirteenth juror. The Defendant argues that the trial court should have rejected the jury's verdicts because the evidence was not sufficient to sustain the Defendant's convictions. The State responds that the trial court fulfilled its duty as the thirteenth juror when it stated that it approved the jury's verdicts.

Tennessee Rule of Criminal Procedure 33(d) provides that "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." This is the modern equivalent of the thirteenth juror rule and "imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case, and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." State v. Biggs, 218 S.W.3d 643, 653 (Tenn. Crim. App. 2006) (internal quotation marks omitted) (quoting State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995)).

It is only when "the record contains statements by the trial judge expressing dissatisfaction with the weight of the evidence of the jury's verdict, or [evidence] indicating that the trial court absolved itself of its responsibility to act as the thirteenth juror, [that] an appellate court may reverse the trial court's judgment" on the basis that the trial court failed to carry out its duty as the thirteenth juror. Carter, 896 S.W.2d at 122. "[T]he accuracy of a trial court's thirteenth juror determination is not a subject of appellate review." State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995).

Here, the record is clear that the trial court fulfilled its duty as the thirteenth juror. The trial court expressly stated at the conclusion of the Defendant's motion for new trial hearing that it approved the jury's verdicts as the thirteenth juror. Additionally, the trial court denied the Defendant's motion for new trial. See Biggs, 218 S.W.3d at 653 (providing that we "may presume the trial court approved the verdict as the thirteenth juror" when it has overruled a motion for new trial without comment). The Defendant's thirteenth juror claim is merely an attack on the sufficiency of the convicting evidence. A claim that the trial court failed to fulfill its duty as the thirteenth juror "is not a proper vehicle to challenge the sufficiency of the convicting evidence." State v. Leath, 461 S.W.3d 73, 115 (Tenn. Crim. App. 2013). Accordingly, we conclude that this issue is without merit.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-15-